IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| POET Research, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Hydrite Chemical Company, <br><br> Defendant. | Case No. 1:24-cv-1285 <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff POET Research, Incorporated ("Plaintiff" or "POET"), through its counsel Honigman LLP, states as follows for its Complaint against Defendant Hydrite Chemical Company ("Defendant" or "Hydrite"):

## NATURE AND BASIS OF ACTION

1. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 101 *et seq*. POET Research, Inc. is the owner and assignee of the inventions claimed in United States Patent Nos. 11,076,621 (the "'621 Patent"), 11,800,884 (the "'884 Patent), and 11,882,861 (the "'861 Patent") (collectively the "Asserted Patents").

2. Hydrite has infringed, both directly and indirectly, the processes, systems, and grain biorefineries claimed in the Asserted Patents without the permission of POET by making, using, offering for sale, selling, and/or importing a compound for use in POET's claimed processes and grain biorefineries into the United States, and/or by inducing others in using, the compound for use in POET's claimed processes and grain biorefineries.

## PARTIES

3. POET Research, Inc. is a corporation organized under the laws of South Dakota, with a principal place of business located at 4615 North Lewis Avenue, Sioux Falls, South Dakota 57104. POET Research, Inc. is a wholly owned subsidiary of POET Holding Company, LLC. POET Holding Company, LLC owns a number of subsidiaries that provide technology, design, construction, management, and other services to ethanol production plants.

4. Hydrite is a company organized under the laws of Wisconsin with a principal place of business at 17385 Golf Parkway Brookfield, Wisconsin 53045. Hydrite has several plant locations across the United States, one of which is located in Illinois at 2545 Bond Street University Park, Illinois 60484.

## JURISDICTION AND VENUE

5. The Court has subject matter jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331, 1367, and 1338.

6. This Court has personal jurisdiction over Hydrite because, at a minimum, Hydrite (i) transacts and solicits business in the State of Illinois, and (ii) is committing acts of patent infringement in the State of Illinois and specifically in this judicial district, upon information and belief, by performing the processes and using the grain biorefineries claimed in the Asserted Patents in Illinois and/or assisting others in performing the processes and using the grain biorefineries claimed in the Asserted Patents in Illinois and specifically in this judicial district. (*See* **Exhibit A**, https://www.hydrite.com/Contact/Locations.htm (showing that Hydrite has a plant location at 2545 Bond Street, University Park, Illinois, which is in this judicial district); *see also* **Exhibit B** (email from personnel at Hydrite indicating that Hydrite is "seeing great results with plant trials in the Indiana [and] Illinois" area regarding the processes claimed in the Asserted Patents).)

7. Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400 because, as set forth directly above, Hydrite has a regular and established place of business in this judicial district and has, on information and belief, committed acts of infringement and/or assisted others in committing acts of infringement in this judicial district. (*See* Exs. A, B.)

## BACKGROUND

8. POET, with its affiliated entities (together, "POET Companies"), is a leader in the production of ethanol and other biorefined products. In 1987, the POET Companies opened a single refinery in South Dakota. Since then, the POET Companies have become one of the world's largest producers of biofuel and a global leader in sustainable bioproducts.

9. Today, the POET Companies design, build, manage, license technology, and provide services at thirty-four (34) bioprocessing facilities across the Midwest, spanning Indiana, Iowa, Michigan, Minnesota, Missouri, Ohio, Nebraska, and South Dakota.

10. The POET Companies' world-class team of researchers and engineers work to create plant-based alternatives to petrochemicals, like bioethanol, dried distillers grains, corn fermented protein, distillers corn oil, biogenic carbon dioxide, purified alcohol, and asphalt rejuvenator. In other words, the POET Companies are leaders not only in the production of ethanol, but also in the production of valuable products, including animal feed, made from the byproduct of the ethanol manufacturing process.

11. To date, POET holds more than 100 U.S. patents and continues its ground-breaking research to yield clean and efficient renewable products and energy.

12. Three of those patents are the Asserted Patents, which provide for innovative technology that remediates toxins present in feedstock that are used in the process to produce ethanol and other co-products.

13. The Asserted Patents provide methods, processes, systems, and grain biorefineries to reduce toxicity, the concentration, or both, of toxins present in feedstock used in biorefinery processes. These inventive processes allow for remediation of feedstock (*e.g.*, grains) and improving the quality and nutritional value of such feedstock that may otherwise go to waste.

14. United States Patent No. 11,076,621, entitled "Remediation of Toxins In Biorefinery Process Streams," was duly and legally issued by the Patent Office on August 3, 2021. A true and correct copy of the '621 Patent is attached hereto as **Exhibit C.**

15. United States Patent No. 11,800,884, entitled "Remediation of Toxins In Biorefinery Process Streams," was duly and legally issued by the Patent Office on October 31, 2023. A true and correct copy of the '884 Patent is attached hereto as **Exhibit D.**

16. United States Patent No. 11,882,861, entitled "Remediation of Toxins In Biorefinery Process Streams," was duly and legally issued by the Patent Office on January 30, 2024. A true and correct copy of the '861 Patent is attached hereto as **Exhibit E.**

17. POET Research, Inc. is the owner and assignee of the '621, '884, and '861 Patents and has the right to sue and recover damages for any past, present, and future infringement thereof.

18. Hydrite is a chemical company that makes industrial products for various industries, including the biofuel industry. Hydrite also offers technology, equipment, and technical consulting support to the industries it serves, including the biofuel industry.

19. One of Hydrite's products is Hydri-Maize™ CB-400 ("CB-400 product"), which is sold to remediate mycotoxins in corn and specifically the corn-grain byproduct of an ethanol manufacturing process. (**Exhibit F** ("Hydrite is pleased to announce the development of two, unique solutions to combat both vomitoxin (DON) and aflatoxin. These two mycotoxins are present in the [sic] corn and thrive in various growing seasons. During the milling process, these

4

mycotoxins are concentrated and reside in the finished animal feed, either wet cake or dry distiller grain (DDG). Hydrite has been investigating chemical solutions to reduce levels of each of these mycotoxins") (which on information and belief was the attachment to Ex. B), *see also* **Exhibit G**, **Exhibit H**, **Exhibit I**.)

20. Hydrite markets its products in Illinois. In particular, Hydrite attends the Illinois Fertilizer & Chemical Association Annual Convention and connects with potential customers there. (**Exhibit J**.)

21. In October 2022, Hydrite contacted the POET Companies to promote its CB-400 product. (Ex. B.) Hydrite provided "early data from the trials" showing the use of its CB-400 product to reduce mycotoxins in the animal feed byproduct of ethanol manufacturing. (*Id.*)

22. A few days later, Hydrite provided the POET Companies with additional information about its CB-400 product, which was a further attempt to promote the CB-400 product to the POET Companies for remediation of mycotoxins. Hydrite provided a SDS (safety data sheet), GRAS (generally recognized as safe), and other product information. (*Id.*)

23. On November 1, 2022, the POET Companies and Hydrite conducted a phone call about Hydrite's CB-400 product and its use to remediate mycotoxins. Hydrite informed the POET Companies that Hydrite was setting up and running trials and selling the product in the eastern territory DON (deoxynivalenol, a type of mycotoxin) affected region. Business was going well and Hydrite stated that they had an eastern account manager who was exclusively setting up trials to reduce DON. Moreover, Hydrite told the POET Companies that the CB-400 product was selling so well that Hydrite had to ramp up production.

24. Thereafter, POET informed Hydrite of its intellectual property, including specifically the '621 Patent, and alleged that the use of Hydrite's CB-400 product would infringe

5

the '621 Patent.

25. Hydrite did not dispute that the '621 Patent would cover the use of CB-400 to remediate mycotoxins in the animal feed byproduct of an ethanol manufacturing process, and Hydrite and POET thereafter discussed the possibility of a license to Hydrite.

26. During those discussions, the '884 Patent issued. POET promptly notified Hydrite of this fact and informed Hydrite that it was infringing both the '621 Patent and '884 Patent by marketing sulfite chemistry to reduce mycotoxins. (**Exhibit K**, November 1, 2023 Letter.)

27. On January 30, 2024, the '861 Patent issued. POET notified Hydrite of the issuance of the '861 Patent on February 2, 2024.

28. Hydrite also sells and advertises other products to reduce mycotoxins.

29. For example, Hydrite advertises and sells Hydri-Maize™ CB-427 ("CB-427") to reduce Mycotoxins. (**Exhibit L**, https://www.hydrite.com/Product/Biofuels/Hydri-Maize-CB-427.htm.)

30. Hydrite's website advertises that an application for CB-427 is "[u]se in thin stillage processing streams to reduce vomitoxin concentrations in DDGs and other liquid grain streams used for animal feed." (*Id.*)

31. Hydrite also advertises and sells the product 2216 ("2216") to reduce Mycotoxins. 2216 is advertised as reducing aflatoxin in corn syrup. (Ex. F.)

32. CB-400, CB-427, 2216, and any other Hydrite product marketed to reduce mycotoxins, including deoxynivalenol, are collectively referred to as the "Accused Products."

33. On information and belief, others, at the direction and encouragement of Hydrite, use the Accused Products in grain biorefineries and biorefinery process streams to form a treated biorefinery process stream with reduced toxins.

34. On information and belief, and consistent with Hydrite's October 2022 email, Hydrite also uses its CB-400 product in grain biorefineries and biorefinery process streams to form a treated biorefinery process stream with reduced toxins. (*See* Ex. B.)

35. On information and belief, and consistent with its advertising, Hydrite also uses its CB-427 and 2216 products in grain biorefineries and biorefinery process streams to form a treated biorefinery process stream with reduced toxins. (*See* Exs. F, L.)

36. Despite its knowledge of the '621, '884, and '861 Patents, Hydrite has continued to make, use, sell, offer for sell, and promote the Accused Products to third-party ethanol manufacturers, and specifically for the use as chemical additives to treat mycotoxins found to be present in the animal feed byproduct of an ethanol manufacturing process. Hydrite has done so without authorization and in disregard of POET's patent rights.

## COUNT I
## (INFRINGEMENT OF U.S. PATENT NO. 11,076,621)

37. Paragraphs 1 through 36 are incorporated by reference as if fully stated herein.

38. Hydrite has infringed, and will continue to infringe, one or more claims of the '621 Patent under 35 U.S.C. § 271(a), either literally and/or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States the Accused Products to be used in connection with remediating toxins in a biorefinery process.

39. On information and belief, Hydrite also uses the Accused Products in a biorefinery process stream to form a treated biorefinery process stream with reduced toxins using the process disclosed in the '621 Patent.

40. **Exhibit M** is a representative claim chart comparing claim 1 of the '621 Patent to the process of using one of the Accused Products, the CB-400 product. As set forth in this chart, Hydrite practices in whole or in material part the technology claimed in the '621 Patent.

41. On information and belief, in addition to promoting and selling the Accused Products for use in remediating mycotoxins found in the animal feed byproduct of a biofuel manufacturing process, Hydrite actively performs that process when testing its products and when performing the process for its customers at a customer biofuel refinery. Accordingly, Hydrite, in using the Accused Products, directly infringes at least claim 1 of the '621 Patent.

42. Hydrite also induces infringement of one or more claims of the '621 Patent under 35 U.S.C. § 271(b). As discussed above, Hydrite has infringed and will continue to infringe the '621 Patent by making, using, offering to sell, selling, and/or importing into the United States the Accused Products to be used in connection with remediating toxins in a biorefinery process. Further, Hydrite has had knowledge of the '621 Patent since at least November 2022, as well as the scope of at least claim 1. (*See* Ex. K.) With that knowledge, Hydrite actively induces infringement by actively and knowingly aiding and abetting another's direct infringement, with specific intent to encourage infringement.

43. Hydrite actively induces its customers—biofuel refineries engaged in the process of manufacturing biofuels including ethanol—to use the Accused Products in a manner that directly infringes at least claim 1 of the '621 Patent, with the specific intent to encourage that infringement.

44. This is shown, for instance, in Hydrite's advertisement to end-users regarding the Accused Products. For example, an advertisement shows that its CB-400 product is "effective in reducing vomitoxin [a mycotoxin] from syrup and DDGs [dry distiller grain]," thus inducing others to use the Accused Products as a treatment in the process of extracting animal feed byproducts from the ethanol manufacturing process. (*See* Ex. G.) Such processes satisfy the requirements of at least claim 1 of the '621 Patent, thereby infringing that patent.

8

45. POET has been and continues to be damaged by Hydrite's infringement of the '621 Patent. The injury to POET is irreparable and will continue unless and until Hydrite is enjoined from further infringement of the '621 Patent.

46. Hydrite's infringement of the '621 Patent is and continues to be willful, deliberate, and ongoing.

## COUNT II
### (INFRINGEMENT OF U.S. PATENT NO. 11,800,884)

47. Paragraphs 1 through 46 are incorporated by reference as if fully stated herein.

48. Hydrite has infringed, and will continue to infringe, one or more claims of the '884 Patent under 35 U.S.C. § 271(a), either literally and/or under the doctrine of equivalents by making, using, offering to sell, selling, and/or importing into the United States the Accused Products to be used in connection with remediating deoxynivalenol (DON) toxins in a biorefinery process.

49. On information and belief, Hydrite also uses the Accused Products in a biorefinery process stream to form a treated biorefinery process stream with reduced DON using the process disclosed in the '884 Patent.

50. **Exhibit N** is a representative claim chart comparing claim 1 of the '884 Patent to the process of using one of the Accused Products, the CB-400 product. As set forth in this chart, Hydrite practices, in whole or in material part, the technology claimed in the '884 Patent.

51. On information and belief, in addition to promoting and selling the Accused Products for use in remediating deoxynivalenol (DON) found in the animal feed byproduct of a biofuel manufacturing process, Hydrite actively performs that process when testing its products and when performing the process for its customers at a customer biofuel refinery. Accordingly, Hydrite, in using the Accused Products, directly infringes at least claim 1 of the '884 Patent.

52. Hydrite also induces infringement of one or more claims of the '884 Patent under 35 U.S.C. § 271(b). As discussed above, Hydrite has infringed and will continue to infringe the '884 Patent by making, using, offering to sell, selling, and/or importing into the United States the Accused Products to be used in connection with remediating DON in a biorefinery process. Further, Hydrite has had knowledge of the '884 Patent since at least November 1, 2023, as well as the scope of at least claim 1. (*See* Ex. K.) With that knowledge, Hydrite actively induces infringement by actively and knowingly aiding and abetting another's direct infringement, with specific intent to encourage infringement.

53. Hydrite actively induces its customers—biofuel refineries engaged in the process of manufacturing biofuels including ethanol—to use the Accused Products in a manner that directly infringes at least claim 1 of the '884 Patent, with the specific intent to encourage that infringement.

54. This is shown for instance in Hydrite's advertisement to end-users regarding the Accused Products. For example, an advertisement shows that its CB-400 product is "effective in reducing vomitoxin [DON] from syrup and DDGs [dry distiller grain]," thus inducing others to use the CB-400 product as a treatment in the process of extracting animal feed byproducts from the ethanol manufacturing process. (*See* Ex. G.) Such processes thus satisfy the requirements of at least claim 1 of the '884 Patent, thereby infringing that patent.

55. POET has been and continues to be damaged by Hydrite's infringement of the '884 Patent. The injury to POET is irreparable and will continue unless and until Hydrite is enjoined from further infringement of the '884 Patent.

56. Hydrite's infringement of the '884 Patent is and continues to be willful, deliberate, and ongoing.

## COUNT III
### (INFRINGEMENT OF U.S. PATENT NO. 11,882,861)

57. Paragraphs 1 through 56 are incorporated by reference as if fully stated herein.

58. Hydrite has infringed, and will continue to infringe, one or more claims of the '861 Patent under 35 U.S.C. § 271(a), either literally and/or under the doctrine of equivalents by making, using, offering to sell, selling, and/or importing into the United States the Accused Products to be used in connection with remediating deoxynivalenol (DON) toxins in a grain biorefinery.

59. On information and belief, Hydrite also uses the Accused Products in a grain biorefinery in a remediation system for remediating deoxynivalenol using the grain biorefinery and systems claimed in the '861 Patent.

60. **Exhibit O** is a representative claim chart comparing claim 1 of the '861 Patent to the grain biorefinery and systems using one of the Accused Products, the CB-400 product. As set forth in this chart, Hydrite practices, in whole or in material part, the technology claimed in the '861 Patent.

61. On information and belief, in addition to promoting and selling the Accused Products for use in remediating deoxynivalenol (DON) found in the animal feed byproduct of a biofuel manufacturing process, Hydrite actively performs and uses the grain biorefinery and systems when testing its products and when performing the process for its customers at a customer biofuel refinery. Accordingly, Hydrite, in using the Accused Products, directly infringes at least claim 1 of the '861 Patent.

62. Hydrite also induces infringement of one or more claims of the '861 Patent under 35 U.S.C. § 271(b). As discussed above, Hydrite has infringed and will continue to infringe the '861 Patent by making, using, offering to sell, selling, and/or importing into the United States the Accused Products to be used in connection with a grain biorefinery and systems to remediate DON

in a biorefinery process. Further, Hydrite has had knowledge of the '861 Patent since at least February 2, 2024, as well as the scope of at least claim 1. With that knowledge, Hydrite actively induces infringement by actively and knowingly aiding and abetting another's direct infringement, with specific intent to encourage infringement.

63. Hydrite actively induces its customers—biofuel refineries engaged in the process of manufacturing biofuels including ethanol—to use the Accused Products in a manner that directly infringes at least claim 1 of the '861 Patent, with the specific intent to encourage that infringement.

64. This is shown for instance in Hydrite's advertisement to end-users regarding the Accused Products. For example, an advertisement shows that its CB-400 product is "effective in reducing vomitoxin [DON] from syrup and DDGs [dry distiller grain]," thus inducing others to use the CB-400 product as a treatment in a grain biorefinery and systems implementing the process of extracting animal feed byproducts from the ethanol manufacturing process. (*See* Ex. G.) Such use of a grain biorefinery and systems thus satisfies the requirements of at least claim 1 of the '861 Patent, thereby infringing that patent.

65. POET has been and continues to be damaged by Hydrite's infringement of the '861 Patent. The injury to POET is irreparable and will continue unless and until Hydrite is enjoined from further infringement of the '861 Patent.

66. Hydrite's infringement of the '861 Patent is and continues to be willful, deliberate, and ongoing.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff POET Research, Inc. respectfully requests that the Court:

a) Enter a judgement that Hydrite has infringed at least one claim of the '621 Patent;

b)     Enter a judgement that Hydrite has actively induced others to infringe at least one claim of the '621 Patent;

c)     Enter a judgment that Hydrite has infringed at least one claim of the '884 Patent;

d)     Enter a judgement that Hydrite has actively induced others to infringe at least one claim of the '884 Patent;

e)     Enter a judgment that Hydrite has infringed at least one claim of the '861 Patent;

f)     Enter a judgement that Hydrite has actively induced others to infringe at least one claim of the '861 Patent;

g)     Enter a permanent injunction enjoining Hydrite, together with any officers, agents, employees, and such other person in active concert or participation with it, who receive actual notice of the Order, from infringing the Asserted Patents;

h)     Award POET damages adequate to compensate for Hydrite's past and willful infringement and any continuing or future infringement, including treble damages, interest, costs, and disbursements under 35 U.S.C. § 284;

i)     Enter a judgment that this case is exceptional within the meaning of 35 U.S.C. § 285 and a judgment awarding POET its reasonable attorneys' fees, costs, and expenses accrued in this action pursuant to 35 U.S.C. § 285; and

j)     Provide such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 15, 2024            Respectfully submitted,

*/s/ Dennis Abdelnour*
Dennis Abdelnour (ARDC No. 6292242)
Vikram Mathrani (ARDCO No. 6318690)
Honigman LLP
155 N. Wacker Drive, Ste. 3100
Chicago, IL 60606
(312) 701-9300
dabdelnour@honigman.com

vmathrani@honigman.com

*Counsel for Plaintiff POET Research, Inc.*